# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| _____ ) | |
| MERIT DIAMOND CORPORATION, a New ) York corporation, ) | |
| ) | |
| ) | Case No. 08 CV 3203 |
| Plaintiff, ) | |
| ) | |
| vs. ) | Judge: Andersen |
| ) | |
| WHITEHALL JEWELLERS, INC., a ) Delaware corporation, ) | |
| ) | Magistrate Judge: Nolan |
| ) | |
| Defendant. ) | **FIRST AMENDED** |
| _____) | **COMPLAINT** |

Plaintiff Merit Diamond Corporation ("Merit"), by its counsel, the Law Offices of Brian Ira Tanenbaum Ltd. and Brown Rudnick LLP, as and for its First Amended Complaint against defendant Whitehall Jewellers, Inc. ("Whitehall", and, together with Merit, the "Parties"), respectfully alleges as follows:

### THE PARTIES

1.     Merit is a New York corporation, having its principal place of business at 1900 Tyler Street, Hollywood, Florida.  Merit is a privately held diamond jewelry manufacturing corporation.

2.     Upon information and belief, Whitehall is a Delaware corporation, having its principal place of business at 125 S. Wacker Drive, Suite 2600, Chicago, Illinois 60606.  Whitehall is a national specialty retailer of fine jewelry and operates stores in regional and super-regional malls under the names Whitehall and Lundstrom

## JURISDICTION AND VENUE

3.        Pursuant to Section 22 of the Whitehall VTA (defined below), the Parties have agreed that any dispute, controversy or claim relating to the Whitehall VTA shall be exclusively resolved by a state court of competent jurisdiction situated in Cook County, Illinois or by the United States District Court for the Northern District of Illinois.

4.        This Court has subject matter jurisdiction over all claims at issue in this action pursuant to 28 U.S.C. § 1332(a)(1), in that the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

5.        Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) and (2) because: (i) Whitehall resides in this District and is the only defendant;  and/or  (ii) a substantial part of the events giving rise to the claims asserted herein occurred in this District.

## FACTS RELATING TO ALL CAUSES OF ACTION

**The Governing Agreements**

6.        On or about February 1, 2006, Merit and Whitehall entered into a certain Vendor Trading Agreement (the "Whitehall VTA"), pursuant to which Merit agreed to sell and/or deliver on consignment to Whitehall, and Whitehall agreed to purchase and/or acquire on consignment on a continuing basis, various jewelry Merchandise.  Defined terms not otherwise defined herein shall have the meanings ascribed to them in the Whitehall VTA.  All Merchandise consigned or otherwise sold to Whitehall by Merit on a "sale or return" basis is also governed by the Terms of Consignment set forth in Exhibit A to the Whitehall VTA and incorporated therein (the "Terms of Consignment").  A copy of the Whitehall VTA, together with the Terms of Consignment, is attached hereto as Exhibit A.

7. Section 7 of the Whitehall VTA, entitled "Merchandise Returns," provides in relevant part as follows:

> In addition to Whitehall's right to return non-conforming Merchandise under Section 5, Whitehall, at its sole discretion, may also return, for full credit, up to ten percent (10%) (based on dollar value) of the previous calendar year's net Merchandise purchases (including any purchases of consigned Merchandise).

8. The Terms of Consignment may be terminated either "for cause" or "other than for cause" in accordance with Sections 12 and 13 therein. A termination "for cause" would require Whitehall to (i) "promptly" return to Merit all Consigned Merchandise unsold as of the date of such termination, and (ii) immediately pay all of its outstanding payment obligations. In contrast, a termination "other than for cause" would effectively grant Whitehall a 180 day period within which to return Merit's Merchandise.

9. On January 21, 2008, the Parties entered into a certain letter agreement (the "January 2008 Letter Agreement," and, together with the Whitehall VTA and Terms of Consignment, the "Governing Agreements") which modified certain of the terms set forth in the Whitehall VTA and the Terms of Consignment. A copy of the January 2008 Letter Agreement is attached hereto as Exhibit B. Pursuant to the January 2008 Letter Agreement, Whitehall agreed to (i) report once a week on the weekly sales from the consignment merchandise and pay Merit within net 15 days of sales, and (ii) order only under the consignment terms and to convert all current asset orders to consignment with net 15 days term only.

**Whitehall's Failure To Pay Amounts Due To Merit, Merit's Default and Termination Notices and the Controversy Regarding Section 7 of the Whitehall VTA**

10. Pursuant to the January 2008 Letter Agreement, Whitehall was obligated to make a payment to Merit on or before May 16, 2008 in the amount of $28,967.32. Merit did not receive such payment. At or around the same time, Whitehall was returning Merchandise to Merit that it had purchased from Merit prior to the year 2007, and claiming full credit for such

3

improper returns, in violation of the clear and unambiguous language of Section 7 of the Whitehall VTA.

11.     As a result of the foregoing, Merit determined to terminate the Whitehall VTA, as well as the Terms of Consignment "for cause," in accordance with the termination procedures set forth in each of those documents.  Accordingly, Merit (i) issued a notice of default to Whitehall on May 16, 2008 (the "May 16 Default Notice"), pursuant to Section 12 of the Terms of Consignment, on account of Whitehall's failure to make timely payments as well as its violation of Section 7 of the Whitehall VTA, and (ii) issued a notice of termination to Whitehall on May 20, 2008 (the "Whitehall VTA Termination Notice"), pursuant to Section 21 of the Whitehall VTA, which effectively terminated the Whitehall VTA as of that date.  Notwithstanding the Whitehall VTA Termination Notice, the terms and provisions of the Whitehall VTA remain in force with respect to Consigned Merchandise until termination of the Terms of Consignment in accordance with the termination procedures contained therein and described above.

12.     Pursuant to the Terms of Consignment, the issuance of the May 16 Default Notice triggered a fifteen (15) business day period in which Whitehall could cure the defaults alleged in the May 16 Default Notice.  Failure by Whitehall to cure the defaults specified in the May 16 Default Notice by June 9, 2008 will result in the immediate termination of the Terms of Consignment "for cause" effective as of that date.

13.     On May 20, 2008, Whitehall responded to the May 16 Default Notice and Whitehall VTA Termination Notice by disputing that it was in default under the terms of the Whitehall VTA and Terms of Consignment.  Moreover, Whitehall took the unilateral -- and erroneous -- position that the May 16 Default Notice and the Whitehall VTA Termination Notice constituted termination of the Terms of Consignment "other than for cause."  Whitehall's

position is inconsistent with the clear and unambiguous language set forth in Section 21 of the Whitehall VTA as well as Sections 12 and 13 of the Terms of Consignment.

14.    Pursuant to the January 2008 Letter Agreement, Whitehall was obligated to make another payment to Merit on or before May 23, 2008 in the amount of $63,493.16. Merit did not receive such payment. Accordingly, on that same day, Merit issued another notice of default (the "May 23 Default Notice"). Whitehall has until June 16, 2008 to cure the default alleged in the May 23 Default Notice.

15.    On May 27, 2008, Whitehall responded to the May 23 Default Notice by once again disputing and denying any and all claims or allegations contained in the Default Notices. Whitehall, in failing to pay Merit the full amounts due to Merit exceeding $125,000.00, has contended -- in contravention of the clear terms of Section 7 of the Whitehall VTA -- that it has the unconditional and absolute right to return any asset Merchandise which was purchased by Whitehall from Merit, including Merchandise purchased at any point in time prior to 2007, as long as the amount returned does not exceed 10% of the net amount of Whitehall purchases from Merit in 2007.

16.    Pursuant to the January 2008 Letter Agreement, Whitehall was obligated to make additional payments to Merit on or before May 29 and 30, 2008 in the amounts of $30,109.50 and $2,620.07, respectively. Merit did not receive those payments. Accordingly, on June 2, 2008, Merit issued another notice of default (the "June 2 Default Notice", and, together with the foregoing default notices, the "Default Notices"). On that same day, Whitehall responded to the June 2 Default Notice by advising that its position had not changed. Whitehall has until June 19 and 20, 2008 to cure the defaults alleged in the June 2 Default Notice.

17. As aforesaid, Whitehall had until June 9, 2008 to cure the defaults alleged in the May 16 Default Notice. Whitehall, however, wrongfully failed to cure such defaults. Accordingly, on June 10, 2008, Merit issued a Notice of Termination of the Terms of Consignment (the "Terms of Consignment Termination Notice") which (i) terminated the Terms of Consignment "for cause," and (ii) terminated the Whitehall VTA as it related to Consigned Merchandise.

18. Section 7 of the Whitehall VTA, however, only grants Whitehall a limited right to return certain Merchandise. In particular, Whitehall can return "up to 10% (based on dollar value)" of the net Merchandise purchases which Whitehall made **in the calendar year 2007 only.** Simply put, under Section 7 of the Whitehall VTA, Whitehall can only return goods purchased in 2007. Notwithstanding Whitehall's assertions to the contrary, Section 7 of the Whitehall VTA, by its terms, does not afford Whitehall the right to return for full credit any Merchandise it may have purchased from Merit in years prior to 2007.

19. According to Merit's books and records, Whitehall's 2007 net Merchandise purchases totaled approximately $2,145,290.17. Whitehall can therefore return to Merit for full credit up to $214,529.00 of the Merchandise that it purchased in 2007. Whitehall claims that its 2007 net asset purchases with Merit totaled 2,555,245.32, thereby giving Whitehall the right to return up to $255,525.00 of Merchandise it may have purchased at any time -- even prior to 2007.

20. In short, Whitehall (i) has wrongfully returned to Merit Merchandise it purchased in years prior to 2007, (ii) has wrongfully demanded a full credit for such "old" Merchandise against amounts due to Merit which exceed $125,000.00, and (iii) has wrongfully offset such

improper credits against certain of its payment obligations that are currently due and owing to Merit and which exceed $125,000.00.

21.     As of the date hereof, Whitehall has made no payments on account of the past due balance of $125,190.05 and has advised that it has no intention of making such payments consistent with its interpretation of Section 7 of the Whitehall VTA.  Moreover, as a result of the termination of the Terms of Consignment for cause on June 10, 2008, Whitehall was obligated to (i) "promptly" return to Merit all Consigned Merchandise unsold as of June 10, 2008, and (ii) immediately pay all of its outstanding payment obligations.  Whitehall has failed to do so.

22.     Accordingly, an actual controversy has arisen and exists between the Parties with respect to the rights afforded to Whitehall under Section 7 of the Whitehall VTA.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(DECLARATORY JUDGMENT)**

23.     Merit repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "22" hereof as though set forth fully herein.

24.     An actual and justiciable controversy exists with respect to Whitehall's right to return Merchandise pursuant to Section 7 of the Whitehall VTA.

25.     Despite the clear and unambiguous language of Section 7 of the Whitehall VTA -- i.e., that Whitehall can only return to Merit for full credit Merchandise it purchased in the year 2007 up to 10% of the net amount of Whitehall purchases from Merit in 2007 -- Whitehall has (i) returned merchandise to Merit that it purchased in years prior to 2007 for a full credit, and (ii) utilized such wrongful and improper credit to fail to pay to Merit and offset against certain payment obligations owed by Whitehall to Merit exceeding $125,000.00.

26.     Merit has no adequate remedy at law.

27.    By reason of the foregoing, pursuant to 28 USC § 2201, Merit is entitled to a declaratory judgment declaring that (i) Section 7 of the Whitehall VTA authorizes Whitehall to return only Merchandise it purchased in the year 2007 up to 10% of the net amount of Whitehall purchases from Merit in 2007 and (ii) as of the date hereof, Merit is owed approximately $194,396.09.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

28.    Merit repeats, realleges and reiterates each and every allegation contained in paragraphs "1" through "27" hereof as though set forth fully herein.

29.    At all relevant times, Merit performed all of the terms, conditions and obligations required of it under the Governing Agreements, and in reliance upon Whitehall's representations and warranties contained therein, continued to ship Consigned Merchandise to Whitehall.

35.    Whitehall's conduct as aforesaid constitutes a willful and material breach of the Governing Agreements.  Among other things, Whitehall breached its obligations under the terms and provisions of the Governing Agreements by: (i) failing to make payments to Merit on account of outstanding invoices in a timely manner, including, but not limited to, as set forth in the May 16 Default Notice, (ii) failing to cure the defaults specified in each of the foregoing default notices, and in particular, the May 16 Default Notice, within the prescribed cure period, (iii) failing to "promptly" return to Merit all Consigned Merchandise unsold as of June 10, 2008, the date of the termination of the Terms of Consignment for cause, and (iv) failing to immediately pay to Merit all of its payment obligations to Merit upon receipt of the Terms of Consignment Termination Notice.

36.    On May 20, 2008, Merit properly terminated the Whitehall VTA and on June 10, 2008, Merit properly terminated the Terms of Consignment for cause.

37.    By reason of the foregoing, Merit is entitled to: (i) the immediate return of all its Consigned Merchandise in Whitehall's possession unsold as of June 10, 2008, and (ii) the immediate payment of all of Whitehall's payment obligations to Merit in the amount of approximately $194,396.09, with interest thereon.

**WHEREFORE**, Merit respectfully requests judgment against Whitehall from the Court as follows:

(a)    declaring that (i) Whitehall may only return Merchandise it may have purchased from Merit in the calendar year 2007 up to 10% of the net amount of Whitehall purchases from Merit in 2007, and (ii) as of the date hereof, Merit is owed approximately $194,396.09 from Whitehall, plus interest thereon;

(b)    directing Whitehall to immediately return to Merit all the Consigned Merchandise unsold as of June 10, 2008;

(c)    granting damages in favor of Merit and against Whitehall in the amount of $194,396.09, plus interest thereon;

(d)    granting Merit its attorneys' fees and costs in prosecuting this action; and

(e)    granting Merit such other and further relief as this Court may deem just and proper.

Dated:  June 18, 2008                    Respectfully submitted,

                                         MERIT DIAMOND CORPORATION,
                                         a New York corporation


                                         By:  /s/ Brian Ira Tanenbaum
                                                  One of its Attorneys

THE LAW OFFICES OF BRIAN IRA TANENBAUM, LTD.
Brian Ira Tanenbaum, Esq. (IL Bar No. 6181447)
John A. Benson, Jr., Esq. (IL Bar No. 6289042)
2970 Maria Avenue, Suite 207
Northbrook, Illinois 60062
Telephone:  847-562-1636
Facsimile:  847-562-1637


BROWN RUDNICK LLP
David Molton, Esq.
Seven Times Square
New York, New York 10036
Telephone:  212-209-4800

*Counsel for Merit Diamond Corporation*

# WHITEHALL JEWELLERS, INC.

155 N. Wacker Drive
Chicago, IL 60606
Telephone: 312-782-6800 Fax: 312-469-5542

## VENDOR TRADING AGREEMENT

### 1. General Information

Effective Date of Agreement: February 1, 2006

| | |
|---|---|
| Vendor Name | MERIT DIAMOND CORPORATION |
| Address | 33 WEST 46th ST |
| Address | |
| City | NEW YORK  State NY  Zip 10036 |
| Telephone | (NY) 391 - 2770  Ext. |
| Toll Free | (300) 289 - MERIT  Ext. |
| Fax | (NY) 398 - 5853 |
| E-mail | |

| | |
|---|---|
| Representative Name | JOSEF FRAIMAN  SR VICE PRES |
| Address | MERIT DIAMOND CORPORATION |
| Address | 33 WEST 46th ST |
| City | NEW YORK  State NY  Zip 10036 |
| Telephone | (NY) 391-2770  Ext. |
| Toll Free | (800) 289-MERIT  Ext. |
| Fax | (212) 398 - 5853 |
| E-mail | yosifraiman @ Aol. com |

| | |
|---|---|
| Accounting Department Contact | SUNIL BASRA |
| Telephone | (212) 391-2770  Ext. 106 |
| E-mail | SBASRA @ MERIT DIAMOND. COM |

| | |
|---|---|
| Vendor Ticketing Contact | NEIL BOGROW |
| Telephone | (212) 391-2770  Ext. 105 |
| E-mail | NBOGROW @ MERIT DIAMOND. COM |

| | |
|---|---|
| Vendor Shipping Contact | NEIL BOGROW |
| Telephone | (212) 391-2770  Ext. 105 |
| E-mail | NBOGROW @ MERIT DIAMOND. COM |

| | |
|---|---|
| Permanent Non-Conforming Return Authorization Number | |
| Defect/Nonconformity Contact | INGRID IRIARTE |
| Telephone | (NY) 391 - 2770  Ext. 133 |
| Transportation Account Name/Number | |

**Sample Merchandise Return Authorization Number**

| Factor Name (*if applicable*) | | |
|---|---|---|
| Factor Address | | N/A |
| Factor Contact | | |
| Telephone | Ext. | |
| E-mail | | |

**Federal Tax Identification Number**    /3 - 3064303

**Registered Trademark**

**Estimated Product Lead time on initial Orders**   5 o  **days**
**Estimated Product Lead Time on initial re-Orders**   3 o  **days**

---

**2. Purchase Orders**

Whitehall Jewellers, Inc. ("Whitehall") desires to purchase and/or acquire on a continuing basis, and Vendor desires to sell and/or deliver to Whitehall on a continuing basis, various goods ("Merchandise") pursuant to the terms and conditions of this Vendor Trading Agreement, including all exhibits (collectively, this "Agreement"). From time to time, Whitehall may submit to Vendor purchase orders, consignment memoranda or other requests for purchase or consignment for Merchandise (collectively, regardless of form, "Orders"). Orders will identify the Merchandise ordered, manufacturer style number, Whitehall stock number, quantity, unit price, total amount due, shipping instructions, and other information deemed relevant to the Order by Whitehall. Within five (5) business days after receiving an Order from Whitehall, Vendor shall respond by either accepting Whitehall's Order as submitted or notifying Whitehall of any proposed modifications. If Vendor proposes modifications, the Order shall not be effective until Whitehall provides its written consent. However, if Vendor does not acknowledge an Order or ships some or all of the Merchandise pursuant to an Order, Vendor shall be deemed to have accepted the Order as submitted. **The terms and conditions of this Agreement shall apply to and supplement any Order, whether or not this Agreement or its terms are referenced in the Order, and no terms or conditions contained in any Order or acknowledgement or acceptance thereof that conflict with those contained herein shall be binding upon Vendor or Whitehall, and each party objects to such conflicting terms and conditions.** Notwithstanding the foregoing, Whitehall may change the quantities or delivery dates or cancel any Order, without charge or liability, by giving notice to Vendor at any time prior to shipment of the Merchandise to Whitehall. All consignment orders are to be in accordance with Exhibit A. Ticketing and shipping requirements are contained in Exhibit B. Ring sizes and special orders must conform to Exhibit C.

Unless otherwise mutually agreed by the parties in writing, prices for gold Orders shall be the London PM Fix established as of the date following the date of the Order. No surcharges will be allowed. All gold must be Plumb Gold. Exhibit D sets forth karatage requirements and Exhibit E contains the requirements of the Assay Policy.

Exhibit F sets forth the policy requirements on colored stones and diamond treatments. Exhibit G sets the diamond weight range requirement. Exhibit H contains the Company Code of Conduct, which contains provisions that will control your activities on the Company's behalf and your dealings with Company personnel.

### 3. Commercial Terms and Invoices

*INCLUSIVE OF SUPPLEMENT ON SCHEDULE A ATTACHED*

All prices and/or price formulas, as set forth in Orders accepted by Vendor, are firm. All shipments originating from locations in the continental United States shall be delivered to Whitehall F.O.B. Shipping Point, Freight Prepaid and Charged Back, provided Vendor complies with the shipping requirements of Exhibit B.  If Vendor fails to comply with any such requirements, the delivery shall be deemed to be made F.O.B. Destination, Freight Prepaid. All shipments made from locations outside the continental United States shall be delivered to Whitehall F.O.B Destination, Freight Prepaid, provided Whitehall will reimburse vendor for reasonable freight and insurance costs. Vendor shall invoice Whitehall for Merchandise at the time of shipment (except for Consignment Merchandise, as defined below) by delivering an original invoice in form and substance as requested by Whitehall which, at a minimum, shall contain the Order number, item number, quantity, unit price, total invoice amount, and such other information as may be required by the Order or other written instructions from Whitehall.

### 4. Shipping

Vendor shall ship all Merchandise in accordance with (i) the shipping requirements indicated on the Order, and (ii) the shipping guidelines or procedures established by Whitehall in Exhibit B and as delivered to Vendor from time to time.

Vendor shall deliver the Merchandise to Whitehall in compliance with the packaging and ticketing requirements set forth in the attached Exhibit B, as such requirements may be modified by Whitehall from time to time upon advance written notice to Vendor. Whitehall may refuse deliveries of Merchandise that do not comply with these requirements.

Time is of the essence for all Orders. If the order sets a deliver due date in accordance with the Product Lead time set forth in section 1, above with respect to any Merchandise not received complete within ten (10) days following the original due date for delivery as set forth in the Order, Whitehall reserves the right to (i) cancel the Order, or (ii), if asset merchandise deduct ten percent (10%) of the invoice amount therefore.  Any invoice with respect to which such a deduction has been made shall be deemed to have been paid in full upon Whitehall's payment of ninety percent (90%) of the invoice amount pursuant to the terms of this Agreement.

### 5. Warranty/Non-Conforming Merchandise

In addition to any other representations, warranties or agreements provided by Vendor hereunder, Vendor represents and warrants to Whitehall that all Merchandise (and any parts and materials thereof) will (i) be of good material and workmanship, and free from defects in workmanship and/or materials, (ii) conform to any requirements, representations, specifications, drawings, samples, and quality and other standards provided or required therewith or therefore, (iii) be merchantable, and (iv) be free and clear of all liens, claims, security interests (other than

# Whitehall Jewellers Vendor Trading Agreement

that of Vendor as provided in the below described Terms of Consignment, if applicable), or encumbrances and not subject to the rights of any third-party.

Whitehall may inspect the Merchandise and, with respect to non-conforming Merchandise or Merchandise in excess of the quantities ordered, may return or hold such Merchandise at Vendor's risk and expense, and may, in either event, charge Vendor for the cost of transportation, shipping, insurance, unpacking, examining, repackaging, reshipping, and other like expense. In addition to any other obligations of Vendor or remedies set forth in this Agreement, Vendor shall, at Whitehall's option, promptly replace, repair or provide full credit or a refund for returned Merchandise or other Merchandise not conforming to the warranties in this section. Whitehall shall be under no duty to inspect Merchandise prior to Whitehall's retention, use or resale and Whitehall's retention, use or resale of the Merchandise shall not constitute acceptance of any Merchandise that does not comply with the requirements of this Agreement. In addition, Whitehall will be entitled to a ten percent (10%) late fee for all initial defective Merchandise. For the avoidance of doubt, non-conforming Merchandise that passes Whitehall's initial inspection upon delivery, but is later determined to be non-conforming may be returned to the Vendor for full credit, repair, replacement or refund (at Whitehall's sole discretion).

If Whitehall elects to have any item repaired or replaced, and such item is not returned to Whitehall within thirty (30) days following shipment to the Vendor, Whitehall will be entitled, at its option, to a full credit or refund.

## 6. Trademarks

Vendor warrants that it will stamp all jewelry Merchandise with Vendor's trademark and quality mark as well as the "WH" mark in compliance with Applicable Laws, including without limitation, 15 U.S.C. Section 297. If stamping of the trademark and quality mark is not possible due to design constraints, a string ticket must be attached. Any Merchandise that does not comply with these requirements may be returned to Vendor as non-conforming Merchandise pursuant to Section 5 hereof.

## 7. Merchandise Returns

In addition to Whitehall's right to return non-conforming Merchandise under Section 5, Whitehall, at its sole discretion, may also return, for full credit, up to ten percent (10%) (based on dollar value) of the previous calendar year's net Merchandise purchases (including any purchases of consigned Merchandise). Returns may include both damaged and undamaged Merchandise. For these purposes, Whitehall may use the Permanent Non-Conforming Return Authorization Number set forth in Section 1.

## 8. Sample Merchandise

Upon Whitehall's request, Vendor will provide to Whitehall Merchandise samples for consideration, quality assurance, approval and photography ("Sample Merchandise"). Vendor shall indicate the price of all Sample Merchandise on the packing list therefor (if applicable, at the then current gold market with increment). Sample Merchandise must be shipped F.O.B. Destination, Freight Prepaid to the address set forth in Section 6, provided that title to Sample

**Whitehall Jewellers Vendor Trading Agreement**

Merchandise shall not pass except upon subsequent purchase of the Sample Merchandise by Whitehall. Upon Whitehall's request, Vendor shall promptly ship up to two (2) additional items of any Sample Merchandise to Whitehall without charge. Notwithstanding anything else contained herein, Vendor shall not charge Whitehall for, and Whitehall shall not be obligated to pay, freight or insurance charges on Sample Merchandise submitted to Whitehall.

Vendor must ticket all Sample Merchandise with the Vendor's name, style number, cost, diamond weight, and diamond quality.

Vendor must communicate with the appropriate Whitehall buyer via e-mail to ascertain the status of any Sample Merchandise within thirty (30) days following the original shipment date. If Whitehall does not adopt an item of Sample Merchandise after a commercially reasonable period of time, or in the event that Whitehall discontinues adoption of such item, Whitehall will, upon Vendors written request, purchase the Sample Merchandise or return the item to Vendor at Whitehall's expense.

### 9. Payment Terms

Due Date (from the date of receipt of <u>Asset Purchase Order Merchandise</u> by Whitehall) is 90 days. Due Date (from the date of receipt of <u>Memo Sell Down Invoice</u> by Whitehall) is 45 days.

All Merchandise consigned or otherwise sold to Whitehall by Vendor on a "sale or return" basis ("<u>Consigned Merchandise</u>") shall, in addition to being governed by the terms of this Agreement, be governed by the Terms of Consignment set forth in <u>Exhibit A</u> (the "<u>Terms of Consignment</u>"), which exhibit is attached hereto and incorporated herein. To the extent that any terms or provisions of this Agreement conflict with those of the Terms of Consignment with respect to Consigned Merchandise, the Terms of Consignment shall control.

### 10. Factor Notification

In the event that Vendor enters or has entered into an arrangement or agreement with a factor to sell, assign or otherwise transfer to such factor all or any portion of its right, title or interest in or to any invoice(s) payable by Whitehall to Vendor, Vendor shall provide Whitehall with the then current name, address, phone number, and name and email address of the contact person of and for such factor (collectively, the "<u>Factor Information</u>"). To the extent that Vendor has entered into such an arrangement or agreement as of the Effective Date, Vendor shall provide the Factor Information where requested in Section 1 of this Agreement. Otherwise, Vendor shall provide the Factor Information to Whitehall in writing no later than ten (10) days following the date that it enters into such an arrangement or agreement. In any event, Vendor shall notify Whitehall in writing upon any changes to the Factor Information. Vendor understands and agrees that Whitehall may provide to Vendor's factor(s), and authorizes Whitehall to so provide, information regarding Whitehall's relationship with such factor(s), including but not limited to, information regarding or related to Merchandise purchased or otherwise acquired by Whitehall from the factor and Vendor's invoices therefor paid or payable by Whitehall.

### 11. Monthly Reporting

## Whitehall Jewellers Vendor Trading Agreement

For each calendar month during the term of this Agreement, Vendor shall provide Whitehall within five (5) business days following each month end, in a form and with detail acceptable to Whitehall, (i) a full statement of account of all amounts owed to Vendor by Whitehall during such calendar month (including all credits and adjustments), (ii) a full statement of all consigned Merchandise delivered to Whitehall and the associated values therefor, and (iii) all transactions, in appropriate detail, for such month. Any requests for additional information made by Whitehall or its agents will be responded to promptly by Vendor.

## 12. Purchase Rebate

Vendor shall rebate to Whitehall one-and-a-half percent (1.5%) of the dollar amount of all net Merchandise purchases made and received by Whitehall during each 12-month period of February 1 to January 31.

The one-and-a-half percent (1.5%) rebate will be due and payable by Vendor to Whitehall in the calendar month immediately following the end of the rebate period. Whitehall shall be entitled to receive the rebate, at Whitehall's sole discretion, as a deduction from invoice ("DFI"), a credit memo against any amounts owed by Whitehall to Vendor, or in cash.

## 13. Marketing Allowance

Vendor will rebate to Whitehall two percent (2%) marketing allowance with respect to net Merchandise purchases made and received by Whitehall during each 12-month period of February 1 to January 31. The two percent (2%) allowance will be due and payable by Vendor in the calendar month immediately following the end of the allowance period. Whitehall shall be entitled to receive the marketing allowance, at Whitehall's sole discretion, as a DFI, a credit memo against any amounts owed by Whitehall to Vendor, or in cash.

## 14. Display Allowance

When items of Merchandise are to be placed in a new in-store display unit, the full cost of such display unit will be charged to the Vendor. If the Merchandise is housed in a new display unit together with merchandise of other suppliers, the cost of the display unit will be apportioned by Whitehall among Vendor and such other suppliers based upon the anticipated use of the display unit for Vendor's and the other suppliers' merchandise, as determined by Whitehall in its sole discretion.

Prior to the development of a display unit, Whitehall shall use its best efforts to provide to Vendor either a description, illustration or rendering of the display unit and an estimate of the display unit cost.

## 15. Confidentiality

Vendor agrees that it shall hold in confidence and not disclose to third-parties or possess or use (except to fulfill its obligations under this Agreement) any business, technical or other information or materials including, without limitation, the existence or terms of this Agreement or any Order, disclosed to Vendor by Whitehall, its officers, directors, employees, consultants or

agents ("Confidential Information"), and will promptly notify Whitehall in writing of any unauthorized release of Confidential Information. For purposes of this Agreement, Confidential Information shall not include information or materials that Vendor demonstrates: (a) were known to Vendor prior to the Effective Date, free of any obligation of nondisclosure; (b) were in the public domain prior to the date received by Vendor or which subsequently came into the public domain through no fault of Vendor; (c) were lawfully received by Vendor from a third party free of any obligation of nondisclosure; or (d) are or were independently developed by Vendor or any of its affiliates, employees, consultants or agents without reference to any Confidential Information. All Confidential Information shall remain solely and exclusively the property of the Whitehall. Notwithstanding the foregoing, Vendor may disclose Confidential Information to the extent that (i) it has obtained Whitehall's advance written consent, or (ii) it is required by any applicable governmental authority to do so; provided, however, that in such event, to the extent permitted by Applicable Laws, Vendor shall notify Whitehall and shall cooperate with Whitehall in any attempt to contest or limit such required disclosure, at Whitehall's sole expense.

Vendor acknowledges that it is aware, and that it has advised its directors, officers, employees, agents, advisors and any other representatives who are informed as to the matters which are the subject of this Agreement, that the United States securities laws may prohibit any person who has material, non-public information concerning Whitehall or the matters subject of this Agreement from purchasing or selling securities of Whitehall or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

The terms of this Section shall survive termination or expiration of this Agreement.

## 16. Vendor's Indemnity

Vendor agrees to protect, defend (at Whitehall's election), hold harmless, and indemnify Whitehall, its officers, directors, agents, employees, successors, assigns and customers from and against any and all claims, actions, lawsuits, liabilities, product recalls, losses, royalties, damages, or costs and expenses (including attorney's fees) arising out of, relating to, or resulting from: (a) any actual or alleged infringement of any patent, trademark, trade secret, copyright, trade secret right or other intellectual property right by any Merchandise sold or consigned to Whitehall, (b) any actual or alleged breach of any covenants, terms, warranties and representations by Vendor contained herein or elsewhere, (c) any actual or alleged violation by Vendor of Applicable Laws. The provisions of this Section shall survive any expiration or termination of this Agreement.

## 17. Vendor Certification

Vendor shall promptly provide Whitehall and/or its agents with any information, materials, documentation and other cooperation requested of Vendor necessary to complete Whitehall's annual vendor certification process with respect to Vendor, which process shall include, without limitation, Vendor's written certification to Whitehall of its compliance with the Kimberley Process Certification Scheme, as required above (each, an "Annual Vendor Certification").

## 18. Standards and Compliance with Law

Vendor represents and warrants that it and its officers, directors, employees and agents will perform all Vendor's obligations hereunder in compliance with any and all federal, state, local or other laws, regulations, rules, codes, guides or ordinances and all other applicable judicial and administrative judgments, orders or decrees applicable to its activity including, without limitation, those prohibiting bribery, unlawful inducements or similar payments or practices, and those related to environmental protection, health and safety (collectively, "Applicable Laws"). Without limiting the foregoing, Vendor represents and warrants that in performing its obligations hereunder (i) Vendor and all items of Merchandise made in whole or in part of gold, silver or inferior metal, or any of their alloys, and all packaging, tickets, cards, labels, boxes, covers, wrappers, stamps, brands, imprints, marks, quality marks, representations, descriptions and engravements therefore, thereon or attached thereto shall fully comply with the provisions of the National Stamping Act (15 U.S.C. Sections 294 - 300), as amended, and any applicable Bureau of Standards Definitions, and (ii) Vendor shall not take or fail to take any action that constitutes an unfair or deceptive practice as established by, or that violates any applicable rules, guides or guidelines of, the Federal Trade Commission (the "FTC"), including without limitation, the FTC's "Guides for the Jewelry, Precious Metals, and Pewter Industries," as may be amended and supplemented from time to time.

Vendor shall provide Whitehall all information and materials necessary to enable Whitehall to comply with any and all Applicable Laws relating to its resale of Merchandise, including without limitation, those relating to markings, ticketing, lead content disclosure and descriptions of the Merchandise.

Vendor agrees to promptly notify Whitehall's Chief Compliance Officer, pursuant to the notice provisions set forth in Section 23 hereof, of any violations of this Section by Vendor or its officers, directors, employees and agents of which it become aware.

## 19. Conflict Diamond Policy

It is Whitehall's policy to support the diamond industry's self-regulation program created to supplement the governmental certification scheme known as the "Kimberley Process Certification Scheme" that is aimed at preventing criminals from insinuating contraband diamonds mined in African combat zones into the legitimate supply chain. The core of that program is a chain of warranties that will follow rough diamonds, polished diamonds, and jewelry containing diamonds through the supply chain. Accordingly, Vendor represents, warrants and guarantees that during the term of this Agreement (i) it shall comply with all requirements of the Kimberley Process Certification Scheme, and (ii) all diamonds mined on or after January 1, 2003 that are included in or may now or hereafter become part of Merchandise sold or delivered to Whitehall have been purchased from legitimate sources not involved in funding any conflict and in compliance with United Nations resolutions, and that such diamonds are conflict free, based on personal knowledge and/or written guarantees provided by the supplier of such diamonds. Vendor shall renew such representation, warranty and guarantee on

each invoice for the sale to Whitehall of rough diamonds, polished diamonds, or jewelry containing diamonds by making the following statement thereon: "*The diamonds herein invoiced have been purchased from legitimate sources not involved in funding any conflict and in compliance with United Nations resolutions. [Name of Vendor] hereby guarantees that such diamonds are conflict free, based on personal knowledge and/or written guarantees provided by the supplier of such diamonds.*" With respect to any and all diamonds mined prior to January 1, 2003, Vendor represents and warrants that (a) Vendor will not knowingly sell conflict diamonds, (ii) to the best of Vendor's knowledge, any such diamonds now or hereafter included in Merchandise do not include conflict diamonds, and (c) to the best of Vendor's ability, Vendor shall undertake reasonably measures to help prevent the sale of conflict diamonds. On at least an annual basis, Vendor shall upon Whitehall's request certify to Whitehall in writing that it is and has for the prior year been in compliance with the Kimberley Process Certification Scheme, such certification to be in form and substance reasonably satisfactory to Whitehall.

---

## 20. Code of Conduct/Ethics

Vendor represents and warrants that it has read and understands Whitehall's *Code of Conduct* (attached hereto as Exhibit H), and Vendor agrees that in connection with any of its activities related to this Agreement it shall not take or fail to take, and shall cause its officers, directors, employees and agents to not take or fail to take, any action that may cause or contribute to any violation by Whitehall or any of its officers, directors, employees or agents of the provisions of such *Code of Conduct* or any other Whitehall policies of which Whitehall has given Vendor prior written notice, as same may be amended from time to time by Whitehall and provided to Vendor.

Specifically, Vendor acknowledges, without limitation, that Whitehall's *Code of Conduct* includes, in part, a policy regarding Gifts and Entertainment, which Vendor is required to observe.

Vendor represents and warrants that in connection with any of its activity related to this Agreement it shall comply with the ethical standards, principles and practices of the (i) Jewelers of America ("JA"), as set forth in JA's Code of Ethics, Rules of Professional Conduct and Business Practices, and Supplier Code of Conduct, as same may be amended, supplemented or replaced from time to time, and (ii) the American Gem Trade Association ("AGTA"), as set forth in AGTA's Code of Ethics and Principles of Fair Business Practice, as same may be amended, supplemented or replaced from time to time.

In addition, Vendor shall not (a) use child, forced or prison labor in connection with the manufacture and supply of Merchandise hereunder, or (b) offer gifts, bribes, kickbacks, free travel or other cash or non-cash incentives to Whitehall's directors, officers, employees, agents or consultants. The delivery of Merchandise to Vendor shall constitute Vendor's representation and warranty that it has complied with the requirements of this Section.

Vendor agrees to promptly notify Whitehall's Chief Compliance Officer, pursuant to the notice provisions set forth in Section 23 hereof, of any violations of this Section by Vendor or its officers, directors, employees and agents of which it become aware.

| 21. Term and Termination |
| --- |

THIS AGREEMENT SHALL COMMENCE AS OF THE EFFECTIVE DATE AND SHALL REMAIN IN EFFECT UNTIL TERMINATED BY EITHER PARTY UPON AT LEAST THIRTY (30) DAYS ADVANCE WRITTEN NOTICE BY ONE PARTY TO THE OTHER PARTY, PROVIDED THAT, NOTWITHSTANDING ANY SUCH TERMINATION, THE TERMS OF THIS AGREEMENT SHALL CONTINUE WITH RESPECT TO CONSIGNED MERCHANDISE UNTIL TERMINATION OF THE TERMS OF CONSIGNMENT AS PROVIDED IN THE TERMS OF CONSIGNMENT.

| 22. General Terms |
| --- |

This Agreement, including any exhibits or schedules hereto, and any Order issued hereunder shall be the complete and exclusive agreement between Whitehall and Vendor with respect to Merchandise purchased from and/or delivered by Vendor on or after the Effective Date, and neither this nor any Order may be modified except in a writing signed by authorized representatives of the parties. No prior proposals, quotations, statements, forecasts, course of dealing or usage of trade will be part of the agreement between the parties with respect to any Order. This Agreement terminates and supercedes any other agreement(s) between the parties with respect to the subject matter hereof.

Whitehall's exercise of any of its rights under this Agreement shall be in its sole and absolute discretion. Whitehall may set-off or recoup any amounts owed to Whitehall by Vendor against any amount payable at any time by Whitehall to Vendor.

The parties shall endeavor to resolve any dispute, controversy or claim relating to this Agreement (each, a "Dispute") first through good faith negotiations between the parties. If the parties are unable to resolve the Dispute in this manner after using commercially reasonable efforts, such Dispute shall be exclusively resolved by a state court of competent jurisdiction situated in Cook County, Illinois or by the United States District Court for the Northern District of Illinois. Vendor irrevocably submits to the jurisdiction of each of these courts. The parties expressly acknowledge that the laws of the state of Illinois, except its conflict of law rules, will govern this Agreement and any Orders. Vendor further consents to the jurisdiction of and venue in any court in which a lawsuit is filed against Whitehall asserting one or more claims from and against which Vendor is obligated to protect, defend, hold harmless, and indemnify Whitehall.

Vendor may not assign any right or delegate any duty hereunder without Whitehall's prior written consent. Any attempted assignment or delegation by Vendor shall be void.

Vendor will be considered an independent contractor for all purposes, shall not be deemed to be Whitehall's agent, employee or subcontractor under any circumstance and shall not have any authority to bind Whitehall or otherwise hold itself out as a representative of Whitehall.

Whenever possible, each provision of this Agreement will be interpreted in a manner so as to be effective and valid under Applicable Laws, but if any provision is held to be prohibited or invalid under Applicable Laws, such provision will be ineffective only to the extent of such

prohibitions or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Any notice, consent, or other communication hereunder, other than routine operational communications, shall be in writing, and shall be given personally, by confirmed fax or express delivery to either party at their respective addresses listed on the face page hereof or such other address as may be designated by written notice of either party. Notices shall be deemed given when delivered, transmitted, or seven (7) days after deposit in the mail. Except as may be otherwise provided herein, (i) notices given to Whitehall shall be directed to "Attn.: Executive Vice-President of Merchandising," with a copy to "General Counsel," at the address appearing at the top of this Agreement and (ii) notices given to Vendor shall be sent to the address in Section 1 and directed to "Attn.: President."

The terms of this Section 23 shall survive the expiration or termination of this Agreement.

WHEREFORE, the parties have each executed this Agreement as of the date and year first written above.

**Vendor**

MERIT DIAMOND CORPORATION

By: _Henry M. Dubrow_
Signature of Vendor Officer

HENRY M. DUBROW
Printed Name

CHIEF FINANCIAL OFFICER
Title

WHITEHALL JEWELLERS, INC.

By: _____
Debbie Nicodemus-Volker
Its Executive Vice President,
Merchandising and Marketing

Exhibit A – Terms of Consignment

All capitalized terms used but not defined in these Terms of Consignment shall have the meanings ascribed to them in the Vendor Trade Agreement by and between Vendor and Whitehall (the "VTA").

## 1. Consignment of Merchandise

(a) The Vendor (hereinafter referred to as, "Consignor") shall deliver (collectively, the "Consigned Merchandise"), to Whitehall (hereinafter referred to as "Consignee") (Consignor and Consignee, collectively hereinafter, the "Parties") on consignment at the times agreed by the Parties pursuant to consignment memoranda. Consignment memoranda issued pursuant to these Terms of Consignment shall be considered an attachment to and incorporated into these Terms of Consignment.

(b) Consignee shall accept each delivery of Consigned Merchandise and hold it available for sale according to the terms of these Terms of Consignment.

(c) The Parties intend that the transfer and delivery of goods by Consignor to Consignee pursuant to these Terms of Consignment shall be characterized as a "Consignment" by a "Consignor" to a "Consignee" within the respective meanings of each such term under the Uniform Commercial Code as adopted in each applicable jurisdiction (the "U.C.C.") and that the provisions of the U.C.C. relating to consignment, including without limitation Sections 9-103, 9-317, 9-319 and 9-324 thereof, shall apply hereto. Consignee shall sign and deliver to Consignor such documents or instruments for filing in all appropriate locations as Consignor shall reasonably request to give notice of Consignor's ownership of the Consigned Merchandise. Consignee hereby authorizes Consignor to file such documents or instruments (including U.C.C. financing statements) in all appropriate locations as shall be reasonably necessary to protect Consignor's ownership of the Consigned Merchandise.

## 2. Title to Consigned Merchandise

Consignor is and shall remain the owner of Consigned Merchandise, retaining full title to each item of Consigned Merchandise until its shipment or transfer to a buyer in the ordinary course of business in accordance with these Terms of Consignment, at which time title to such item sold will transfer from Consignor to the buyer thereof. Except as provided in paragraphs 9 and 10 of these Terms of Consignment, the Consignee shall have no obligation to make any payment to the Consignor in respect of any item of Consigned Merchandise until and unless such transfer of title to such buyer has occurred. Consignee shall acquire no right, title or interest in the Consigned Merchandise other than the right to possess the Consigned Merchandise as a consignee and sell the Consigned Merchandise as provided under these Terms of Consignment.

## 3. Consignee's Cooperation to Preserve Consignment

Consignee shall cooperate with Consignor to comply with any law, rule or regulation governing Consigned Merchandise, including cooperating as to the execution and filing of any agreement, financing statement, notice or other document reasonably required to carry out the terms and intent of these Terms of Consignment.

## 4. Authority to Sell Consigned Merchandise

Consignee is authorized to sell Consigned Merchandise for the benefit of Consignor pursuant to these Terms of Consignment. All sales of Consigned Merchandise may be made on any terms and at any price consistent with Consignee's business judgment at Consignee's sole discretion.

## 5. Purchases and Payments

From time to time, Consignee shall place Orders with Consignor for additional quantities of consigned items. These items will be delivered to Consignee within two (2) weeks of Consignor's receipt by fax of the applicable Order from Consignee. These items will be added to the base of Consignment Merchandise.

The Consignee will report to the Consignor sales of Consignment Merchandise monthly (Monthly Sales Report - see Section 11). Upon receipt of the Monthly Sales Report, Consignor will issue an invoice to Consignee with respect to all items of Consigned Merchandise sold during such month, which invoice shall have a due date of forty-five (45) days after its receipt by Consignee. Payments will be made by wire transfer to the bank(s) designated from time-to-time by Consignor. For the avoidance of doubt, for all payments made by Whitehall prior to such due date, Vendor shall provide Whitehall the Cash Discount described in Section 4 of the VTA.

## 6. Location of Consigned Merchandise

(a)Consigned Merchandise shall remain in Consignee's possession or control at all times, at Consignee's risk of loss, until it is sold by Consignee or is returned to Consignor pursuant to these Terms of Consignment.

(b)Consignee may transfer Consigned Merchandise in its possession to any location listed in Schedule B at any time during the term of these Terms of Consignment or to any of the Consignee's repair shops.

## 7. Expenses of Sale

Expenses related to any sale of Consigned Merchandise, including expenses incurred to maintain any premises where Consigned Merchandise is located, are Consignee's exclusive obligation.

## 8. Return of Consigned Merchandise

(a)Consignee may, in its sole discretion, return any or all Consigned Merchandise to Consignor at any time, provided that the risk of loss, damage or destruction of such Consigned Merchandise, shall remain on Consignee until it is delivered to Consignor in its original condition.

(b)Upon the termination of these Terms of Consignment, for any reason, Consignee shall, at its expense, return any unsold Consigned Merchandise in its possession to Consignor pursuant to the terms of these Terms of Consignment.

(c)Within thirty (30) days of receipt of returned Consigned Merchandise, Consignor shall provide Consignee a memorandum of receipt describing the Consigned Merchandise, and its condition on return if different from its original condition.

## 9. Care of Consigned Merchandise

Consignee shall exercise reasonable care in possessing and preserving Consigned Merchandise. Any costs incident to such possession and preservation shall be the obligation of Consignee.

## 10. Insurance

Consignee shall insure Consigned Merchandise in its possession against risks of loss, damage or destruction, including theft or destruction by fire for which insurance may be reasonably retained in an amount equal to the full value of such Consigned Merchandise. Consignee shall pay all premiums, deductibles, and other costs incurred in connection with such insurance, which shall designate Consignor as an additional insured. In the event of such loss, damage or destruction, Consignor shall be entitled to the immediate payment of proceeds of any insurance claims related to the Consigned Merchandise and to the extent of Consignor's interest in Consigned Merchandise. Upon Consignor's written request, Consignee shall deliver to Consignor a Certificate of Insurance relating to the Consigned Merchandise naming Consignor as an additional insured there under.

## 11. Records

(a)Consignment and Delivery Memoranda - with each shipment of Consigned Merchandise, Consignor shall furnish a Consignment and Delivery Memorandum to Consignee which describes the Consigned Merchandise delivered to Consignee and indicates (i) the quantity, by items, and (ii) the cost of each item as set forth in Schedule A. Each Consignment and Delivery Memorandum issued pursuant to this paragraph shall be considered an attachment to and incorporated in these Terms of Consignment.

Consignee shall prepare "Monthly Sales Reports" at its expense indicating (i) all Consigned Merchandise delivered pursuant to these Terms of Consignment, (ii) the date any Consigned Merchandise is sold, (iii) the description, cost (as set forth in Schedule A), and date of any Consigned Merchandise returned to Consignor by Consignee (the "Monthly Sales Report"). Monthly Sales Reports together with original sales documents shall be available for inspection by Consignor upon the delivery of reasonable notice to Consignee.

## 12. Inventory

Consignee shall take inventory of Consigned Merchandise in its possession at least once per year, and shall be responsible for any discrepancies between Monthly Sales Reports and Delivery and Consignment Memoranda.

## 13. Termination for Cause

The following shall constitute events of default of these Terms of Consignment: (1) Default in the payment by Consignee or performance of any of Consignor's or Consignee's obligations or agreements under these Terms of Consignment; (2) Any representation or warranty of Consignee or Consignor made herein or in any certificate, statement or agreement furnished in connection with these Terms of Consignment should prove to be false or misleading in any material respect and results in damages to the other party; (3) Consignee or Consignor shall (i) make an assignment for the benefit of creditors, (ii) file or suffer the filing of any voluntary or involuntary petition under any chapter of the United States Bankruptcy Code which, as to any involuntary petition, is not withdrawn or dismissed within thirty (30) days, (iii) apply for or permit the appointment of a receiver, trustee or custodian of any of its property or business, or (iv) make an admission of its inability to pay its debts as they become due; or (4) An attachment on the Consigned Merchandise delivered hereunder shall occur and shall not be vacated within ten (10) business days thereafter, or

(5) Consignee sells or transfers any Consigned Merchandise to any person, except to a buyer in the ordinary course of business. In the event of the occurrence of an event of default as defined herein, the non-defaulting party may terminate these Terms of Consignment for case upon written notice to the other party. Upon such termination, the Consignee shall promptly return to Consignor all Consigned Merchandise unsold as of such date and all Consignee's payment obligations to Consignor hereunder shall, if Consignee is the defaulting party, become immediately due and payable. A termination for cause pursuant to (1) or (2) herein shall be preceded by written notice to the defaulting party specifying the basis of the claimed default, and failure to cure same within fifteen (15) business days following the notice.

## 14. Termination of Terms of Consignment (other than for cause)

Upon one hundred-eighty (180) days' prior written notice to Consignee, Consignor may terminate these Terms of Consignment and demand that any or all Consigned Merchandise unsold as of the end of such notice period be returned to Consignor at Consignee's risk and expense. Consignee shall return such Consigned Merchandise or pay for any Consigned Merchandise not returned at the prices indicated on the Memo no later than the end of such notice period. Notwithstanding anything to the contrary herein, Consignor may not terminate these Terms of Consignment under this paragraph between July 1 and December 31 of any year nor may Consignor demand the return of Consigned Merchandise between July 31 and December 31 of any year.

Subject to the foregoing, upon one hundred-eighty (180) day's prior written notice, Consignee may terminate these Terms of Consignment, and Consignee shall return all unsold Consigned Merchandise, no later than at the end of such notice period.

## 15. Governing Law

The laws of the State of Illinois shall govern these Terms of Consignment.

## 16. Complete Agreement/VTA

These Terms of Consignment, together with the VTA, terminate and supercede all prior agreements between the parties with respect to Consigned Merchandise and contain the complete and exclusive statement of the terms of agreement between Consignor and Consignee with respect to Consigned Merchandise. Goods, other than Consigned Merchandise, may be purchased by Consignee from time to time from Consignor exclusively pursuant to the terms of the VTA. Consignee may offset any amount(s) owed to Consignee by Consignor against any amount payable at any time by Consignee to Consignor, whether any such amount(s) arises pursuant to these Terms of Consignment, the VTA or any other agreement between the parties. Any modification of these Terms of Consignment shall not be enforceable unless in writing and signed by both Consignor and Consignee.

To the extent that these Terms of Consignment conflict with that certain agreement entitled "Terms for Treatment of Trade Indebtedness of Whitehall Jewellers, Inc." and the superseding definitive agreements contemplated therein (collectively, the "Term Sheet"), the Term Sheet shall control so long as it has not been terminated by the parties, or any of them, or by its terms.

15

## Whitehall Jewellers Vendor Trading Agreement

## Exhibit B – Shipping and Ticketing Requirements

Shipping Requirements

Unless otherwise indicated in the Order, Vendor shall ship Merchandise, and obtain insurance therefore (if applicable), as follows:

All packages shipped by Vendor to Whitehall Jewellers must be shipped via Federal Express or the Whitehall designated armored service. A **"Routing Guide"** will be provided once a vendor number has been established. The routing guide will request vendor contact information and will provide the third party account numbers to use as the "Bill To" on Whitehall Jewellers shipments. The third party account numbers provided may not be used on "prepaid or charged back" shipments. The routing guide will identify the designated armored service Vendor must use, Brinks or Dunbar, in those instances where an armored carrier is necessary.

   a. Please combine shipments to allow for the least number of packages being shipped at any one time. FedEx shipments are to be shipped "Express – Next Afternoon".
   b. Packages containing merchandise valued up to $15,000 must be shipped FedEx uninsured.
   c. Packages containing merchandise valued over $15,000 must be shipped insured via the designated armored service.
   d. Whitehall may designate the carrier, including armored service, in the Order, routing guide or by other written instructions at any time prior to shipment.
   e. Preprinted airbills will be provided for the carriers if necessary.
   f. Merchandise must be shipped in FedEx boxes. Tape both ends of the box to ensure that the package is secure.
   g. Packages are to be addressed as follows:

   > N-VAK & ASSOCIATES
   > 155 N. WACKER DRIVE 5TH FLOOR
   > CHICAGO, IL 60606

Vendor must fax confirmation of receipt of the Routing Guide to (312) 469-5702.

Ticketing Requirements

Merchandise tickets must be obtained from Data2; see below for Data2 details.

Please review these ticketing requirements to ensure that you have a clear understanding of how our Merchandise must be ticketed prior to shipment to our offices. Read these instructions and call **(312) 782-6800, ext. 311**, if you have any questions.

With the Routing Guide, you will receive a set of pictures showing the correct procedure for attaching tickets.

- Rings require the barbell ticket be placed around the shank.

- Earrings should have the rattail ticket placed through the earring nut. **DO NOT ATTACH THE TICKET TO THE EARRING POST.** Leverback earrings are the exception. The rattail ticket may be applied to the post of leverback earrings.

- **DO NOT USE A SEPARATE POLY BAG FOR EACH EARRING**. Combine the pair and use one polybag per pair.

- Boxed items should have the square ticket attached directly to the bottom of the box.

- Country of origin must be stamped on the actual Merchandise or appear on the tickets. We will not accept merchandise with separate country of origin tickets. Please do not attach any other tickets to Whitehall merchandise.

- You will need to use clear Ziploc polybags to secure the Merchandise. For rings, earrings and pendants use a 2x3-size Ziploc polybag. For bangle bracelets, please use a 3x4-size polybag. For omega necklaces, you will need the appropriate size Ziploc polybag to accommodate the size and shape of the Merchandise. Please **DO NOT** use polybags with any print or lettering on them. DO NOT STAPLE THE POLYBAGS TOGETHER.

- **PLEASE DO NOT TICKET SEMI-MTGS OR PENDANTS WITHOUT CHAINS. You must still order the tickets from DATA2, but simply enclose the full sheet of tickets with the merchandise.**

- **IF THESE GUIDELINES ARE NOT FOLLOWED, YOU WILL BE CHARGED $0.15 PER PIECE.**

## DATA2 Procedures

### Establishing a New Account with Data2

All new vendors should contact Data2 Sales Support to get set up as a Data2 customer at (800) 227-2121 Ex. 452.

Domestic vendors will receive 2 forms to fill out and send back to Data2 - A Credit Agreement and a New Account form. Mindee will provide both forms to the vendor when they contact Data2 to be set up. International vendors will be required to provide Data2 with a credit card or wire-transfer payment for all Purchase Orders in addition to filling out the 2 forms mentioned above. Data2 accepts Visa, Master Card, or American Express.

### Product Specifications:

| Ticket Size | Format: Sheets |
|---|---|
| 2.044" x .45"  Barbell | (45 tickets per sheet) |
| 2.236" x .45"  Rattail | (45 tickets per sheet) |
| 1.0" x  1.0" Box | (45 tickets per sheet) |

**Whitehall Jewellers Vendor Trading Agreement**

**PRICE:**

| | |
|---|---|
| * Barbell Ticket | .073/Each |
| * Rattail Ticket | .073/Each |
| * Box Ticket | .02/Each |

There is a $25.00 minimum invoice fee on all vendor orders.

## Turnaround Time for All Vendor Orders

All orders will batch every day at 7:00 a.m. Pacific Time with the following production schedule:

| Batch Day | Ship Day |
|---|---|
| Monday | Wednesday |
| Tuesday | Thursday |
| Wednesday | Friday |
| Thursday | Monday |
| Friday | Tuesday |

## Order Method

Vendors may order tickets via the IGR program online. IGR instructions are attached below. The vendor will need a User name and Password to access the IGR program. Existing vendors may contact Customer Service at (800) 227-2121 for their user name and password. New vendors will need to be established with Mindee before they are given access to the IGR program.

## Data Management

Ticket information is transmitted on a daily basis to Data2 via nightly download from Whitehall.

## Data2's Internet Global Retail Instructions

To access the program, open your browser and type http://www.edata2.com in the address bar. This will bring you to our EData2 Homepage. A login page will be displayed where you enter your user name and password, and click 'Submit.' This takes you to the Main Menu. From here, you can access all the Global Retail functions.

### Step 1:
**PO Form:**

1. From the Main Menu, click 'All Other POs.' You will then enter your new PO number. You are not required to reference Whitehall's PO number. **Please note that you may not submit the same PO number twice.** To edit an existing PO, type in the number and 'tab' out of the field. This will pull up the shipping and billing information attached to your PO. You can only edit a PO up to transmission to Data2. Once it has been transmitted, it will not be available to edit.
2. Enter your PO number, and then select the appropriate 'Bill to' code and 'Ship to' code from the drop-down boxes. Click the 'Select' button to display address information on the screen. You may only choose from the codes that are listed in the drop-down boxes. If you do not see the code that you need, please call Customer Service at 800-227-2121.
3. Select the ship method from the drop-down list. *You will need to contact Customer Service to have your UPS or FedEx account number permanently added to your account information.
4. Click the 'Save PO' button.

    *Expedite Option: If you need your order to ship before our next available ship date, you can select the 'expedite – yes' option. Please note that there is a $100-$300 fee for this service, depending on

how quickly you will need the tickets. Selecting this option does not guarantee your order will ship early. You are required to contact our Customer Service department to have your request approved.

### Step 2: (Optional)
**To send Item Set-Up information:**

1. Click 'Item Set-Up'. Select Whitehall Jewellers from the drop down menu. When the item set-up page is displayed, enter the information. Click 'Save record' to transmit information to Data2. Repeat these steps as necessary for each PLU.

2. To edit records you have already entered through the EData2 IGlobal website, select Whitehall from the drop-down menu. Enter your item or PLU number and 'tab' out of the field. This will pull up any information you have attached to your PLU. You can edit the PLU from this screen. Click 'Save Record' when you are finished.

### Step 3:
**All Other Orders Form:**

• Select Whitehall Jewellers from the drop-down list under the heading 'Enter a New PLU.' Enter the PLU number and the quantity. You can enter up to 10 new items at a time before clicking the 'save information' button. *Once you click the 'Save Information' button, the PLU's will automatically be moved to the 'Order an Existing PLU' category.

• Once you have finished entering and saving all the information, scroll to the bottom of the page. You will be able to select from a list of available PO numbers. Select the PO number you wish to use, and click 'Preview Order.' A new page will display with the PO and Order information you have entered. When you have verified all the information, click 'Submit.' Your order has now been submitted to Data2.

Orders must be received by 7 a.m. Pacific Standard Time, in order to be processed that day. From the Main Menu, click 'Batch Information' to display our batching schedule.



<u>Exhibit C – Ring Sizes and Special Orders</u>

All ladies rings are to be shipped in a stock ring size 7. All men's rings are to be shipped in a stock ring size 11. Whitehall may from time to time special order Merchandise with non-stock gold colors and non-stock ring sizes at the same price and with the same shipping charges as offered for Vendor's stock colors and ring sizes, <u>plus</u> only a nominal non-stock sizing fee (for non-stock ring sizes) to be mutually agreed by Vendor and Whitehall. Upon Whitehall's request, Vendor shall provide Whitehall a list of the mutually agreed non-stock sizing fees.

**Whitehall Jewellers Vendor Trading Agreement**

Exhibit D – Karatage Policy

Unless stricter standards of fineness are required by Applicable Laws, in which case Vendor shall comply with such stricter standards, Vendor agrees that (i) the actual fineness of all items of Merchandise made in whole or in part of gold or one of its alloys shall not be less by more than $3/1000^{th}$ parts than the fineness indicated by the mark stamped, branded, engraved, or printed upon any part of such item, or upon any ticket, card, or label attached thereto, or upon any box, package, cover, or wrapper in which such item is enclosed, or as indicated by any specifications for such item made by Vendor to Whitehall, provided that the part of the item taken for the test, analysis, or assay shall be such part or portion as does not contain or have attached thereto any solder or alloy of inferior fineness used for brazing or uniting parts of such item, and (ii) the actual fineness of the entire quantity of gold or of its alloys contained in an item of Merchandise, including all solder and alloy of inferior fineness used for brazing or uniting parts of such item (all such gold, alloys, and solder being assayed as one piece), shall not be less by more than $3/1000^{th}$ parts, in the case of a watchcase or flatware, or than $7/1000^{th}$ parts, in the case of any other such item, than the fineness indicated by the mark stamped, branded, engraved, or printed upon any part of such item, or upon any ticket, card, or label attached thereto, or upon any box, package, cover, or wrapper in which such item is enclosed, or as indicated by any specifications for such item made by Vendor to Whitehall.


## Exhibit E – Assay Policy

Whitehall may at random assay selected jewelry Merchandise from Vendor not to exceed five percent (5%) of the items of Merchandise delivered to Whitehall. Vendor will be notified if such Merchandise <u>does not</u> meet the karatage standards set forth in Exhibit D. Whitehall shall, at Vendor's expense, return or destroy all assayed Merchandise, whether or not it meets the required karatage standards, and Vendor shall refund to Whitehall any amounts paid by Whitehall for such Merchandise (including any associated shipping, handling and insurance costs). Whitehall shall be entitled to receive the refund, at Whitehall's sole discretion, as a DFI, a credit memo against any amounts owed by Whitehall to Vendor, or in cash.

**Whitehall Jewellers Vendor Trading Agreement**

Exhibit F - Colored Stone and Diamond Treatment Policy

It is Whitehall's policy not to offer for sale to its retail customers any diamond or colored stone which has been treated in any way, except such treatments as are permanent, nondetectable and acceptable in accordance with industry standards and norms. All colored stones and diamonds sold or consigned by Vendor to Whitehall shall conform to this policy. **Provided, however, that** Vendor shall never supply to Whitehall any diamond or colored stone which has been laser drilled or fracture filled. Vendor must include a written statement of treatment type, or lack thereof, in all memoranda and invoices for diamonds or colored stones delivered by Vendor to Whitehall.

**Whitehall Jewellers Vendor Trading Agreement**

## Exhibit G – Diamond Weight Range Policy

It is Whitehall's policy to always offer for sale to its retail customers diamonds with weight representations (including weight ranges) therefor that conform to the requirements of this Agreement and Applicable Laws. With respect to each diamond supplied to Whitehall by Vendor, Vendor shall provide Whitehall with a written statement of diamond weight, and the diamond weight and the statement of diamond weight therefor shall comply with the following: (a) any single diamond, either mounted or loose, must not exceed a weight variance of ½ pt. (.005 carat) from its stated weight; and (b) any multiple diamond, or total weight diamond item, must not exceed a weight variance of 1 pt. (.01 carat) from its stated weight.

Exhibit H - Code of Conduct

## WHITEHALL JEWELLERS, INC.
## CODE OF CONDUCT

**Introduction**

This Code of Conduct summarizes long-standing principles of conduct Whitehall Jewellers, Inc. (the "Company") follows to ensure our business is conducted with integrity and in compliance with the law. Every employee, officer and director is expected to understand and follow the policies outlined in this Code. Any employee, officer or director who violates the letter or spirit of these policies is subject to disciplinary action up to and including termination of employment and recovery of damages. However, most problems can be avoided by using good judgment and seeking guidance when questions arise.

It is important to report all violations or suspected violations of the Code. If you have a question about the policies outlined in the Code, contact your supervisor or the Corporate Compliance Officer. You may also direct questions and report violations to the confidential reporting hotline (the "Hotline") at 877-888-0002.

**Compliance With Laws, Rules and Regulations**

Employees, officers and directors must comply fully with all applicable foreign, federal, state and local laws, rules and regulations that govern the Company's business conduct, including antitrust laws, customs regulations, securities and insider trading laws and anti-corruption laws. If you are uncertain as to whether or how a law or regulation applies to you please contact your supervisor or the Corporate Compliance Officer.

It is against Company policy and generally against United States law to make formal or informal agreements with competitors regarding prices, conditions of sale and any other matter which could impact the competitive environment.

When traveling outside of the United States, all employees, officers and directors should be careful to investigate and understand the foreign laws that may apply to them, as they vary widely from country to country. If you need assistance please contact your supervisor or the Corporate Compliance Officer. All employees, officers and directors traveling outside of the United States must comply with applicable customs regulations. These rules require that you report merchandise brought back from foreign countries.

All employees, officers and directors are required to comply with all anti-bribery laws (including the Foreign Corrupt Practices Act). No employee, officer or director may provide or offer something of value to government officials (U.S. or foreign) in order to improperly influence their acts or decisions.



**Whitehall Jewellers Vendor Trading Agreement**

## No Discrimination or Harassment

The Company is an equal opportunity employer. It has long been the policy of the Company to make all employment decisions including hiring, job assignment, training, compensation, promotion, transfer, discipline, and termination, without regard to race, color, creed, sex, age, national origin, sexual orientation, or any physical or mental handicap unrelated to the ability to perform a given job.

The Company will not tolerate sexual harassment or other inappropriate behavior of any employee. Sexual harassment includes unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. Other harassment may include harassment of any employee on the basis of his or her race, religion, color, gender, age, national origin, disability or sexual orientation. Forms of such harassment may include physical, verbal or non-verbal behavior that harasses, disrupts, or interferes with an employee's work performance or in any way creates or contributes to an intimidating, hostile or offensive work environment.

The Company has no desire to intrude into the private lives of employees. However, employees should be aware of the Company's commitment to providing a working environment free from sexual harassment and that the Company may face potential liability because any consensual relationship between Company employees may ultimately change and result in an allegation of sexual harassment.

Accordingly, employees who have or enter into an off-duty consensual relationship with another employee that could have a potential of sexual harassment must inform a Human Resources Manager, the Director of Human Resources, or the Senior Vice President of Human Resources. If sexual harassment issues arise and the Company determines that the undisclosed relationship existed without management notification, both employees will be subject to disciplinary action up to and including termination. As a rule, any member of management in our Company (including Store Managers, District Managers, Regional Vice Presidents or anyone else in a position of authority or in a position of making employee decisions) is prohibited from establishing a personal or dating relationship with another employee within their area of management or supervision, or within an area that can authorize action affecting the employee's compensation or employment.

The Company recognizes that mutual employee participation in a variety of off-duty activities may not be subject to the above potential disadvantages and may fall outside the intent of this policy. Any employee who is uncertain about or has a question regarding dating or other off-duty social relationships should consult with a Human Resources Manager, the Director of Human Resources, or the Senior Vice President of Human Resources.

The Company is committed to providing a work environment free from discrimination and sexual harassment. Any violation of the above policies will be thoroughly investigated in a professional and confidential manner



## Health and Safety

All company activities must fully comply with applicable laws and policies relating to health and safety. You are responsible for knowing the laws and policies that relate to your job. For more information regarding employee health and safety issues, call the Human Resources Manager – Benefits or the Director of Human Resources. You may also consult the Company's on-line operations manual.

## Workplace Violence

To ensure a safe workplace, the Company does not tolerate any type of workplace violence committed by or against employees, officers and directors. You are prohibited from making threats or engaging in violent activities. Following is a list of behaviors, while not all inclusive, that provides examples of prohibited conduct:

- Causing physical injury to another person;
- Making aggressive remarks;
- Aggressive or hostile behavior that creates a reasonable fear of injury to another person or subjects another individual to emotional distress;
- Intentionally damaging employer property or property of another employee; or
- Possession of a weapon or explosive device on Company property or while on Company business.

## Drugs and Alcohol

You may not use, possess, be under the influence of, distribute, or sell alcohol or illegal drugs on Company premises, while engaged in Company business, or while on Company time except for the moderate use of alcohol as may be appropriate at a business function if you will not be returning to work on the day of the function.

## Personal Use of Telephone or Company Mail Service

The Company's telephone and mail services are intended primarily for business purposes. Employees are, however, permitted to make limited personal use of the Company's telephone and mail services, provided that the use is reasonable, does not contravene any of the Company's policies and procedures, and does not interfere with our work.

Employees are required to use professional judgment when making or accepting personal phone calls while on the job. Personal calls should be limited to those which are absolutely necessary, and be brief. This includes usage of both Company telephones and personal cell phones. Personal long distance calls must be paid for by the employee making the call. Personal mail should be addressed to your home and employees cannot use Company postage, envelopes, etc. for personal use. Conduct that violates Company policy includes use of the telephone systems (including voicemail) and mail services for communication of a sexual, discriminatory, profane or offensive nature (i.e. jokes or slurs related to race, sex, religion, age, sexual orientation, or disability), for political purposes, or for any form of solicitation not directly related to our business, including solicitations for charitable organizations.

## Company Computer, E-mail and Internet Usage Policies

Our Company's information resources are intended primarily for business purposes. Authorized persons using the Company's system for e-mail and internet access are, however, permitted to make limited personal use of e-mail and the Internet, provided that the use is reasonable, does not contravene any of the Company's policies and procedures, and does not interfere with our work. All data that moves over our network is and remains Company property and the Company reserves the right for management to monitor any and all employee e-mail communication and computer files at any time without notice. Email, Internet, and computer usage utilizing Company resources is considered public, not private, information and all such communication is required to follow Company policy and procedure guidelines.

Conduct that violates Company policy includes use of e-mail for chain letters, political purposes or any form of solicitation not directly related to our business, including solicitations for charitable organizations, use of the network or Company computers for downloading or transmitting copyrighted material such as copyrighted songs, games, movie clips, text, and images for which the Company does not have rights of use, and communication of a sexual, discriminatory, profane, or offensive nature (i.e. jokes or slurs related to race, sex, religion, age, sexual orientation, or disability). Such communication includes items such as screen savers, communication sent or received, visiting inappropriate websites or chat rooms, downloading or uploading information or files, etc. Inappropriate information accessed or created on company computers via desktop, floppy disk, or CD is also prohibited.

## Prohibition Against Insider Trading

In general, employees, officers and directors who have access to, or knowledge of, material nonpublic information from or about the Company are prohibited from buying, selling or otherwise trading in the Company's stock or other securities. "Material nonpublic" information includes any information, positive or negative, that has not yet been made available or disclosed to the public and that might be of significance to an investor, as part of the total mix of information, in deciding whether to buy or sell stock or other securities.

Such insiders also are prohibited from giving "tips" on material nonpublic information, that is directly or indirectly disclosing such information to any other person, including family members, other relatives and friends, so that they may trade in the Company's stock or other securities. Furthermore, if, during the course of your service with the Company, you acquire material nonpublic information about another company, such as one of our customers or suppliers, or you learn that the Company is planning a major transaction with another company (such as an acquisition), you are restricted from trading in the securities of the other company.

Such "insider trading" is both unethical and illegal, with criminal penalties of up to $5 million and a jail term of up to 20 years and civil penalties of up to three times the illegal profit gained or loss avoided.

In order to assure strict compliance with the Company's insider trading policy, directors, officers, supervisors or executive office personnel are strictly prohibited from buying or selling any securities of the Company (other than purchases of securities acquired through the exercise of an option issued by the Company or trades made pursuant to a Rule 10b5-1 trading plan), except during the period commencing one full business day after the date of public


announcement of the Company's most recent quarterly or annual earnings and ending on the 20th business day thereafter and only when notified of such a period by the Company.

The Company's policies regarding insider trading and confidentiality are presented to each employee upon commencement of their employment. A copy of the complete policy is available on the Company's on-line operations manual.

### Compliance with Individual Reporting and Trading Requirements

Executive officers and directors of the Company, as well as persons holding a specified amount of the Company's outstanding common stock and certain other "affiliates" of the Company, are subject to reporting requirements and trading restrictions under the securities laws. These reporting requirements include the obligation to report trades in the Company's common stock under Section 16 and/or Section 13 of the Securities Exchange Act of 1934. All officers and other employees and directors of the Company are expected to comply with the securities laws and regulations and the reporting requirements thereunder, as well as Company policies adopted to assist in such compliance.

### Conflicts of Interest

Business decisions must be made in the best interest of the Company, not motivated by personal interest or gain. Therefore, as a matter of Company policy, all employees, officers and directors must avoid any actual or perceived conflict of interest.

A "conflict of interest" occurs when an individual's personal interests interfere or conflict in any way (or even appear to interfere or conflict) with the interests of the Company. A conflict of interest situation can arise when an employee, officer or director takes actions or has interests (financial or other) that may make it difficult to perform his or her company work objectively and effectively. Conflicts of interest also may arise when an employee, officer or director, or a member of his or her family, receives improper personal benefits as a result of his or her position in the Company, regardless of whether such benefits are received from the Company or a third party. Loans to, or guarantees of obligations of, employees, officers and directors and their respective family members are of special concern. Federal law currently prohibits the Company from making loans to directors and executive officers.

You must obtain the written approval of the Corporate Compliance Officer before doing Company business (other than sales of merchandise at the advertised selling price or in compliance with the Company's Senior Executives and Independent Directors Purchase Program or another published employee purchase program) with parties such as relatives, spouses or life partners, and must always keep the Company's interests top priority in those interactions. You may not pressure or apply undue influence on others within the Company into (i) hiring a relative or friend as an employee of the Company or (ii) transacting business with a relative or friend as a supplier, vendor or landlord of the Company.

Except as described below, employees may not work for or receive compensation for personal services from any supplier, vendor, landlord or competitor of the Company, or any business entity that does or seeks to do business with the Company. Employees may not work at another job that involves competition with the Company, working during the hours in which the employee is working for the Company or use of Company facilities or property.



Employees must obtain approval from the Corporate Compliance Officer before serving on the board of directors of another for-profit company. Employees may serve as a director, trustee or officer of a non-profit organization in their individual capacity and on their own time, but must receive prior permission from the Corporate Compliance Officer to do so as a representative of the Company.

It is difficult to identify exhaustively what constitutes a conflict of interest. For this reason, employees, officers and directors must avoid any situation in which their independent business judgment might appear to be compromised.

### Gifts and Entertainment

No employee of the Company, nor a close friend or relative of a Company employee, may directly or indirectly accept, solicit, *or* furnish any gift or favor to or from any company, organization, or other person or entity that has done, is doing, or is seeking to do business with the Company, unless the gift or favor is nominal or otherwise could not reasonably be intended to reward or influence Company action. Any non-nominal gift must be declined or returned unless acceptance is approved in writing by the Senior Vice President of Human Resources. In this context, "nominal" means that the total value of all gifts and favors (excluding entertainment, which is discussed below) from the same or a related source within a single calendar year is less than $50. Cash gifts, regardless of their size, are never nominal.

If an offer of money or any other non-nominal gift is made by any customer or supplier to an employee of the Company, or to a close friend or relative of a Company employee, the employee must immediately report the incident to his or her supervisor with a copy simultaneously delivered to the Senior Vice President of Human Resources. Additionally, all gifts received must be recorded and reported to the Company on a quarterly basis.

From time to time employees may accept *or* offer entertainment that is business related, but only if the entertainment is customary and reasonable in light of the nature of the supplier or customer and seniority level of the employee, and only if the entertainment does not involve inappropriate excessive expenditures. Entertainment must be limited to meals and industry business functions. In all cases, both the person offering the entertainment and the person accepting it must be present. No entertainment may be provided to any person other than employees of the Company or of a Company supplier or customer, except, where appropriate, those employees' spouses or domestic partners. All entertainment *provided* by a Company employee must be appropriately documented, and all receipts for such entertainment must be submitted in connection with requests for reimbursement on a weekly expense report. All entertainment *received* by a Company employee must be reported to the Company on a quarterly basis.

If an employee has any question about the propriety of accepting or offering a particular gift or entertainment activity, the Senior Vice President of Human Resources should be consulted.

The Chief Executive Officer, Executive Vice Presidents, Senior Vice Presidents, Vice Presidents, District Managers, and all Support Office Supervisors must certify annually their compliance with this policy.

### Political Contributions and Other Political Activities

**Whitehall Jewellers Vendor Trading Agreement**

Participation in political activities may not occur on work time or use the Company's property and such activities must not include the use of the Company's name. No employee, officer or director of the Company may directly or indirectly make or solicit any political contribution in the Company's name or that is intended to influence political activity for the benefit of the Company, whether or not made in the Company's name.

## Corporate Opportunities

Employees, officers and directors are prohibited from: (i) taking for themselves personally opportunities that properly belong to the Company or are discovered through the use of corporate property, information or position; (ii) using corporate property, information or position for personal gain; and (iii) competing with the Company. Employees, officers and directors owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

## Confidentiality

As an employee, officer or director of the Company you may have access to confidential information of the Company or those entities and persons with whom the Company does business. You are responsible for the safekeeping of this information. Confidential information should be used only as necessary to do your job and for the Company's business purposes, and never for your own benefit. Except as necessary to do your job and in compliance with laws and regulations and this Code of Conduct, you should not reveal confidential information to any third party unless specifically authorized to do so by the Company. You should not share confidential information with friends, relatives or other non-employees, or discuss confidential matters in public places, such as elevators, public transportation (including airplanes) or restaurants.

Confidential information includes any information that has not been made available to the public that provides insight into our current or anticipated business activities. It also includes important nonpublic information about third parties with which we have dealings, including customers and suppliers. Examples of confidential information include personal employee information, financial information, and information regarding sales initiatives and pricing.

All inquiries regarding the Company from non-employees, such as financial analysts and journalists, should be directed to the Company's Chief Financial Officer at (312) 762-9751.

## Government Proceedings and Requests for Information

The Company's policy is to cooperate with every reasonable request of government investigators for information. At the same time, the Company is entitled to all the safeguards provided by law for the benefit of persons under investigation or accused of wrongdoing, including legal representation. You should contact the Corporate Compliance Officer before responding to any governmental inquiries, inspections, subpoenas or requests.

Business records are Company assets and must be retained or destroyed in compliance with the Company's records retention and management policy now in place or as it may be implemented from time to time. In addition, employees, officers and directors must adhere to any compliance program implemented in connection with the records retention and management policy. In accordance with that policy, in the event of litigation or a government investigation, relevant records must be retained and preserved. All information provided to any governmental body or

agency should be truthful and accurate and must not obstruct, influence or impede the request for information. You should not alter, falsify, mutilate, cover up or destroy any documents or records related to a government request or investigation or legal proceeding that you are aware is or may be underway.

Any employee, officer or director who does not cooperate with a government investigation involving the Company after being requested to do so by the Company is subject to disciplinary action up to and including termination of employment and recovery of damages.

**Fair Dealing**

When interacting with the Company's employees, competitors, suppliers, or customers, each employee should strive to act with integrity and honesty. No employee, officer or director shall take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practices.

**Protection and Proper Use of Company Assets**

All employees, officers and directors must protect the Company's assets and ensure their efficient use. Such assets include inventory and intellectual property such as the Whitehall Jewellers, Lundstrom Jewelers and Marks Bros. Jewelers names, logos, trademarks, patents, copyrights, confidential information, ideas, plans and strategies. Theft, carelessness and waste have a direct impact on the Company's profitability.

**Internal Controls and Public Company Reporting**

Accurate records are essential to the successful operation of the Company. Employees are responsible for ensuring the accuracy of all Company records, information, and accounts. For example, claims on an expense report or time record, payments and other transactions must be correctly recorded and accounted for, and properly authorized in accordance with Company policies. All employees, officers and directors must cooperate and communicate in an open fashion with our internal and external auditors. You must not take any action to unduly influence, coerce, manipulate or mislead any independent certified public accountant engaged in the performance of an audit of our financial statements.

As a public company, the Company is required to file periodic reports and make certain public communications. The Company takes this responsibility very seriously. To that end, each of the Company's executive officers, including the Chief Executive Officer and Chief Financial Officer, must take all reasonable steps to ensure that these reports furnish the marketplace with full, fair, accurate, timely and understandable disclosure regarding the financial and business condition of the Company.

If you are asked to provide, review or certify information in connection with the Company's disclosure controls and procedures or an audit or review of the Company's financial statements, you must provide the requested information or otherwise respond in a full, accurate and timely manner. Moreover, even in the absence of a specific request, you should report to the Company's senior management any information that you believe should be considered for disclosure in our reports that it not being appropriately considered. If you do not believe that such information is being appropriately considered by the Company's senior management you should report your concerns to the Hotline.

Employees must act to ensure full, fair, accurate, timely, and understandable disclosure and reporting of Company information, including the Company's financial results and financial condition. All employees must comply with Company policies, procedures and controls. Accounting and financial reporting of actual transactions and forecasts must follow the Company's accounting policies as well as all applicable generally accepted accounting principles and laws.

## Reporting Illegal or Unethical Behavior or Behavior in Violation of Company Policy

All employees, officers and directors have a duty to adhere to this Code and to report any and all conduct in violation of this Code or any other Company policy. Any failure to report such conduct is subject to disciplinary action. Employees are encouraged to discuss with supervisors, managers or other appropriate personnel possible illegal or unethical behavior or behavior in violation of company policy that has occurred and, when in doubt, about the best course of action in a particular situation.

If you are concerned about a violation of this Code or other illegal or unethical conduct by employees, officers or directors of the Company, contact your supervisor or the Corporate Compliance Officer. You may also contact the Hotline at (877) 888-0002. Confidentiality will be maintained to the fullest extent possible. No employee will be penalized for making a good-faith report of violations of this Code or other illegal or unethical conduct, nor will we tolerate retaliation of any kind against anyone who makes a good-faith report. If you believe that you have been the subject of impermissible retaliation, call the Hotline.

### Policy Changes

Over time, new policies will be written and old ones revised. While we reserve the right to make changes without notice, we will endeavor to notify you of any changes affecting you as soon as possible.

### Waivers

The provisions of this Code may only be waived by the Company's Corporate Compliance Officer, and, in the case of executive officers and directors, by our Board of Directors or the Nominating and Corporate Governance Committee of our Board of Directors.

### Relationship to Other Company Policies

This Code supplements existing Company policies and procedures. Certain policies referred to herein are contained in their entirety in previously distributed Company policies, and employees, officers and directors are instructed to refer to those policy documents for a copy of those policies and required reporting procedures. The Company may from time to time adopt more detailed policies and procedures with regard to certain areas covered by the Code and other matters not mentioned in the Code. Compliance with the Code and compliance with the Company's policies and procedures are a condition of employment. Any employee, officer or director who violates the letter or spirit of these policies is subject to disciplinary action up to and including termination of employment and recovery of damages. In addition, the violation of certain policies may also be a violation of law and could result in the filing of criminal charges by the applicable authorities.

This Code and other corporate policies are statements of goals and expectations for individual and business conduct. They are not intended to, and do not in any way constitute, an

employment contract or an assurance of continued employment. The Company does not create any contractual rights by issuing this Code or other Company policies.

## Acknowledgment

Employees, officers and directors are accountable for reading, understanding and abiding by these policies. The Company may require that employees, officers and directors acknowledge in writing that they have received and read this Code and the Company's insider trading policy, understand it and are complying with it. The Company also may require certain supervisory personnel to complete an annual questionnaire regarding their knowledge of any potential or actual violations of this Code. Newly hired employees and officers and newly appointed directors must sign the acknowledgment.

SUPPLEMENT TO VENDOR TRADING AGREEMENT BETWEEN WHITEHALL

JEWELLERS, INC. [Customer]  and MERIT DIAMOND CORPORATION [VENDOR]

Terms of Asset Purchase Orders:      90 days Provided Customer payment on all prior
                                     invoices have been paid within their payment
                                     terms

Acceptance of Purchase Orders:       Vendor reserves the right to Notify Customer when
                                     the Customer's Total Unpaid Invoices and New
                                     Orders exceed Vendors Internal Approved Credit
                                     Limit (the "Credit Limit"). The Credit Limit is
                                     presently $ 1 million and Vendor
                                     will advise Customer of the Credit Limit on a
                                     monthly basis. In the event that the Credit Limit is
                                     exceeded, Customer maybe advised by Vendor of
                                     the limitation of our Credit Limit and Customer
                                     shall notify Vendor of its desire to prepay certain
                                     outstanding invoices, defer the shipping date(s) of
                                     requested new orders, or cancel such new orders. In
                                     any event, Vendor shall NOT be subject to any late
                                     charges, fees, etc. on any orders NOT shipped
                                     within the requested time due to the Credit Line
                                     limitation.

Consignment:                         Price change of memo merchandise

                                     Effective 60 days after any change in Vendor's unit
                                     Sales Prices, such revised prices shall be applicable to all
                                     customer purchases of Vendor owned memo
                                     merchandise after such 60 day period.

To add the following to the
Termination of Agreement for Cause:

        Upon Vendor's notification from any of it financial institutions that any
        said financial institution has limited Vendor's granting of Credit to Customer .

36

# Whitehall

## Whitehall Jewellers, Inc.

155 NORTH WACKER DRIVE
CHICAGO, IL 60606

312-782-6800
312-782-8299 FAX
www.whitehalljewellers.com

April 7, 2006

Merit Diamond Corp.
33 West 46th St. 5th Floor
New York, NY 10036

Dear Vendor:

Enclosed please find your final executed copy of the Vendor Trade Agreement for your records.

Please note that we have inserted a new page 15 into our agreement. The version sent preciously neglected to specify that, for those of you who signed the vendor term sheet, the terms of the vendor term sheet (and the documentation of the vendor extension er the "VEA") will be applicable, instead of the consignment terms set f final payment under the VEA is made. The new page 15 contains the lan en.

*copy to Sunil 4/10/06*

Your past and future support is key to Whitehall's success, and we lo mutually profitable partnership.

Sincerely,

Judy Fisher
Senior Buyer, Diamonds



Whitehall CO.
Jewellers Since 1895.

LUNDSTROM
JEWELERS

MARKS BROS.
JEWELERS

RECEIVED 01-21-'08 10:32   FROM- 3127629789   TO- Merit USA   P001/001



"Josef Fraiman"
<jfraiman@meritdiamond.co
m>

01/21/2008 04:06 PM

To  <Stephanie_Schnorbus@WHJI.COM>

cc

bcc

Subject  RE: Merit Diamond Corporation

Dear Stephanie,

Following the conversation that Gagi just had with Mr. Ed Dayoob, I would like to confirm their understanding.

1. Whitehall will pay all past due invoices including the $100,578.06 Holiday Flyer amount no later than 01/29/08. (current outstanding is $152,017.)
   Whitehall has already deducted $53,962.15 (Rebate/Allowance) from check# 15300217 which was paid to Merit on 01/09/08.
2. Whitehall will report once a week on the weekly sales from the consignment merchandise and pay within net 15 days of sales.
3. Whitehall will order only under the consignment terms and will convert all current asset orders to consignment with net 15 days term only

If the above is consistent with your understanding, please sign on the line below and fax it back to me @1-954 925 4523.

Best Regards,

Josef Fraiman.


Whitehall Jewelers
X _____
Name:
Title: CEO


From: Stephanie_Schnorbus@WHJI.COM [mailto:Stephanie_Schnorbus@WHJI.COM]
Sent: Wednesday, January 16, 2008 5:06 PM
To: Josef Fraiman
Subject: Merit Diamond Corporation


Dear Mr. Fraiman,

Please see the attachment from Mr. Dayoob.

Regards,

Stephanie Schnorbus
Whitehall Jewelers, Inc.
125 S. Wacker Drive, Suite 2600
Chicago, IL 60606
Phone: 312-782-0238